**DOWN EAST ENERGY CORP.,**
**Plaintiff, Appellee,**

v.

**NIAGARA FIRE INSURANCE**
**CO., Defendant, Appellant.**

**Down East Energy Corp.,
Plaintiff, Appellant,**

v.

**Niagara Fire Insurance Co., et
al., Defendants, Appellees.**

Nos. 98–1966, 98–1967.

United States Court of Appeals,
First Circuit.

Heard Feb. 2, 1999.

Decided April 16, 1999.

Robert M. Kaplan, with whom Miller Christerson McNaboe & Cortner, was on brief, for appellant Niagara Fire Insurance Co.

John M.R. Paterson, with whom James A. Clifford and Bernstein, Shur, Sawyer & Nelson, were on brief, for appellee Down East Energy Corp.

Before TORRUELLA, Chief Judge, BOWNES, Senior Circuit Judge, and LYNCH, Circuit Judge.

TORRUELLA, Chief Judge.

The underlying dispute in this case arises out of a series of pollution liability insurance policies issued to plaintiff-appellee Down East Energy Corporation ("Down East") by defendant-appellant Niagara Fire Insurance Company ("Niagara").

Down East and its sister company, Brunswick Coal & Lumber ("BC & L"), were in the business of selling gasoline and home heating oil. As part of this business, Down East owned the Jordan Bay Mobil gas station located in Raymond, Maine. In 1983, Down East and BC & L each purchased a comprehensive insurance policy for their various businesses through the Morse, Payson & Noyes Insurance Agency. Although the policies were issued by The Continental Insurance Company, both contained a contemporaneous amendment naming Niagara as the actual insuring company. Both policies included insurance against pollution liability. Specifically, the policies provided $500,000 of pollution liability coverage for: (1) third-party damage claims, and (2) government ordered cleanups of leaks and spills from gasoline stations. The 1983 policies became effective on June 15, 1983 and terminated on June 15, 1986.

In 1985, while the 1983 policies were still in effect, Niagara issued a new single policy to BC & L to replace the two 1983 policies. Although the 1985 policy was issued to BC & L, Down East was named as an additional insured and thus was covered by that policy. The 1985 policy continued to provide $500,000 of pollution liability coverage for third-party damage claims and government ordered cleanups. The 1985 policy became effective June 15, 1985 and terminated on June 15, 1986.

In 1986, Down East renewed the 1985 policy to run through June 15, 1987. Again, the renewal policy provided $500,000 of pollution liability coverage for third-party damage claims and government ordered cleanups.

In late 1986, while the policy was still in effect, new governmental regulations increased the required amount of pollution liability coverage to $1,000,000. Because the 1986 policy only provided $500,000 of coverage, Down East needed to find additional coverage. On October 9, 1986, Alan Quinlan, an insurance agent for Morse, Payson & Noyes, submitted a written proposal to Down East outlining Down East's various options. Quinlan proposed two basic options: (1) purchasing an additional policy for $500,000, or (2) canceling the 1986 policy issued by Niagara and purchasing an entirely new policy for $1,000,-

000.[1] Based on Quinlan's recommendation, Down East selected the latter option, purchasing a new $1,000,000 policy from International Surplus Lines Insurance Company ("ISLIC"), and canceling its 1986 Niagara policy.

Down East's 1986 Niagara policy was canceled effective December 23, 1986. Its new ISLIC coverage became effective on the same date. Under both of these policies, Down East was covered for claims made during the policy period as a result of pollution incidents which also occurred during the policy period. Therefore, if a claim was made on December 24, 1986 against Down East for a pollution incident that occurred on December 22, 1986, Down East would have no insurance coverage. The 1986 Niagara policy would not provide coverage because the claim was made after cancellation of the Niagara policy, and the ISLIC policy would not provide coverage because the pollution incident occurred before the effective date of the ISLIC policy. To avoid this gap in coverage, Quinlan recommended that Down East purchase an "Extended Reporting Period Endorsement" from Niagara to extend the reporting period for claims made against Down East for any pollution incidents that may have occurred during the original Niagara policy period. In recommending the purchase of the endorsement to Down East, Quinlan wrote in a letter dated October 9, 1986:

> This option, at a cost of 50% of the annual premium, will cause the [Niagara] policy to respond to claims which are made within the next twelve months, provided that the incident which led to the claim occurred during the policy period. This option, if exercised, allows for a transition from one claims-made policy to another *with no gap in cover-*

*age,* provided that all claims for past pollution incidents are brought within one year. (Emphasis added).

At the time, Down East understood that coverage under the endorsement would be co-extensive with coverage under the original Niagara policy. In other words, Down East understood that the endorsement extended the reporting period for both third-party damage claims and government ordered cleanups. By its terms, however, the endorsement only extended the reporting period for claims made for property damage and bodily injury, and did not extend the reporting period for claims made as a result of government ordered cleanups.

In September 1987, after the 1986 Niagara policy was canceled but while the extended reporting endorsement was still in effect, Down East received notice from the Maine Department of Environmental Protection ("DEP") that a third-party damage claim had been filed against Down East. The claim alleged that a gasoline leak from the Jordan Bay gas station had contaminated a neighboring well.[2] Immediately upon receipt of the DEP notice, Down East informed Morse, Payson & Noyes of the damage claim. However, Morse, Payson & Noyes did not inform Niagara of the claim until March 1988, after the extended reporting endorsement had expired.

On March 29, 1989, Niagara denied coverage for the third-party damage claim on the ground that the loss was not reported to Niagara until March 2, 1988—after the expiration of all the policies issued to Down East by Niagara. Notwithstanding this denial, in the fall of 1989, Down East initiated a comprehensive cleanup program to remove gasoline from the ground and groundwater on the neighboring property.

1. At trial, Quinlan explained that he did not recommend that Down East purchase a Niagara policy with $1,000,000 of pollution liability coverage because Niagara was unwilling to provide a policy with those increased limits.

2. In February 1989, the DEP completed its investigation of the third-party damage claim and concluded that Down East's Jordan Bay gas station was the source of the groundwater contamination. The DEP directed Down East to commence remediation efforts immediately.

The total amount spent on the cleanup exceeded $500,000.

In December 1989, despite its original denial of coverage, Niagara began to reimburse Down East for the costs incurred in the cleanup. In a January 17, 1992 letter, Niagara reversed its earlier position that Down East's claim was not timely reported to Niagara, and concluded that the costs incurred by Down East as a result of environmental damage to the neighboring property were covered. Despite this acknowledgment of coverage, Niagara stopped making reimbursement payments to Down East in December 1992. Nevertheless, Down East continued its remediation efforts.

In December 1995, Niagara again denied coverage. In its denial letter, Niagara reasserted its defense that Down East's claim was untimely in that it was presented to Niagara after the expiration of the extended reporting endorsement. Niagara also raised several other grounds for denial which are not relevant to this appeal. In May 1997, Down East filed this suit.

Down East's amended complaint asserted the following grounds for relief: (1) breach of contract; (2) estoppel to deny coverage; (3) breach of the implied covenant of good faith and fair dealing; (4) failure to comply with various state statutory obligations to pay or deny insurance claims in a timely manner; and (5) estoppel by agency, based on the representations made by Morse, Payson & Noyes.

On November 5, 1997, Niagara moved for summary judgment, which Down East opposed. In its summary judgment motion, Niagara, for the first time, asserted a new ground for denial of Down East's claim, namely, that the extended reporting endorsement did not extend the reporting deadline for initiation of government action.

On December 19, 1997, a magistrate judge recommended summary judgment with respect to Down East's claims of breach of contract, estoppel to deny coverage based on defendants' own conduct, and breach of an implied covenant of good faith and fair dealing. On February 20, 1998, the district court adopted the recommendation of the magistrate, leaving only two causes of action open for trial: (1) estoppel based on agency, and (2) failure to comply with various state insurance statutes.

Trial commenced on July 7, 1998. After the jury retired to deliberate, but before it reached its verdict, Down East voluntarily dismissed its state statutory causes of action. On July 8, the jury returned a verdict in favor of Down East on its estoppel based on agency claim in the amount of $362,996, the policy limit less the amount Niagara actually paid. Judgment was entered in favor of Down East on July 15, 1998. This appeal followed.

Niagara raises three issues on appeal.[3] First, Niagara argues that the district court abused its discretion by denying Niagara's request to reopen discovery less than three weeks before the trial date and nearly eight months after the close of discovery.[4] Next, Niagara contends that Down East's estoppel claim is time-barred.

---

**3.** In its appellate brief, Niagara also challenged the district court's admission of certain evidence at trial. However, at oral argument Niagara withdrew this ground for appeal.

Down East also cross-appealed the district court's grant of summary judgment in favor of Niagara on Down East's breach of contract claim. At oral argument, counsel for Down East indicated that, if we affirmed the judgment below with respect to Down East's estoppel claim, Down East would waive its cross-appeal. Because we do affirm the judg-

ment below, we do not reach the issues raised by Down East's cross-appeal.

**4.** In its appellate brief and at oral argument, Niagara framed this issue as the district court's abuse of discretion in permitting a "last-minute amendment" to Down East's theory of the case. As will be explained, we do not agree that Down East amended its theory of the case. We thus recast Niagara's "last-minute amendment" claim as an appeal from the district court's denial of Niagara's (last-minute) request to reopen discovery.

Finally, Niagara challenges the sufficiency of the evidence. We address each of Niagara's contentions in turn.

## I. Discussion

### A. Denial of Discovery

Niagara first contends that the district court abused its discretion in allowing Down East to amend its theory of the case on the eve of trial without also allowing Niagara to conduct additional discovery. We disagree.

■ First, we agree with the district judge that there was no "last-minute amendment" of Down East's theory of the case. As early as the amended complaint, Down East clearly set forth the factual predicate for the estoppel by agency claim it pursued at trial. Specifically, the amended complaint alleged that: (1) from 1983 through and including 1987, Niagara issued to Down East certain pollution liability insurance policies; (2) Down East procured these insurance policies through Morse, Payson & Noyes, who acted as an agent for Niagara; (3) Morse, Payson & Noyes, as an agent of Niagara, was aware of the risks for which Down East sought coverage and represented to Down East that such coverage had been obtained; (4) Down East reasonably believed that it obtained the coverage it requested and relied on this assumption to its detriment; and (5) Niagara is now estopped to deny coverage. We do not read these allegations as limiting Down East's estoppel claim solely to circumstances surrounding the issuance of the principal insurance policies and not including circumstances surrounding the issuance of the endorsement. *See Conley v. Gibson,* 355 U.S. 41, 47–48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (all that is required of a complaint is "notice pleading," "a short and plain statement of the claim that will give defendant a fair notice of what the plaintiff's claim is and the grounds upon which it rests"). The endorsement itself states, among other things: "[t]his endorsement forms a part of the above-numbered policy and applies as of the effective time and date stated below." The above-numbered policy referenced on the endorsement is Policy CBP 55423—the policy issued to Down East by Niagara in 1986. Thus, the issuance of the endorsement is clearly alleged in the amended complaint.

We also disagree with Niagara's contention that Down East's answers to interrogatories similarly limited its estoppel theory to circumstances surrounding the issuance of the principal insurance policies. While it is true that Down East's answers did not specifically mention the endorsement or identify Quinlan as one of the Morse agents who made certain representations to Down East, we conclude that both the general factual allegations in the amended complaint as well as the interrogatory answers put Niagara on fair notice of Down East's estoppel by agency theory.

■ In its reply brief, Niagara claims that, on appeal, Down East raises an entirely new argument that was never presented in the district court in support of its "last-minute amendment."[5] We do not agree with Niagara's characterization of Down East's appellate argument. In its appellate brief, Down East reiterates the argument it presented in the district court: namely, that its estoppel by agency theory was part of the case from the inception of this litigation. Down East refers to Niagara's "new" defense only to rebut Niagara's claims of unfair surprise and prejudice. Specifically, Down East argues that its general estoppel by agency theory was in the case from the very beginning but

---

5. Specifically, Niagara claims that, in the district court, Down East denied that it ever amended its theory of the case at all. Now, Niagara contends, Down East argues, for the first time on appeal, that it did amend its theory of the case but that Niagara cannot claim unfair surprise or prejudice as a result of that amendment because the amendment was made in direct response to Niagara's endorsement-based defense, which was first raised in Niagara's motion for summary judgment.

that it did not focus specifically and exclusively on the circumstances surrounding the issuance of the endorsement until Niagara first asserted the endorsement defense in its motion for summary judgment. As soon as Niagara asserted this "new" endorsement defense, Down East merely narrowed the focus of its more general estoppel theory to the issuance of the particular endorsement. Because the narrowing of its estoppel theory was precipitated by the same narrowing of Niagara's defense theory, Niagara cannot complain of unfair surprise or prejudice.

Indeed, even if we were to read the amended complaint and answers to interrogatories as narrowly as Niagara would have us read them, our review of Down East's opposition to summary judgment severely undermines Niagara's claims of unfair surprise. Down East's opposition states:

> When Down East met with Morse, Payson & Noyes in 1985, just as it had done every other year, it explained that it wanted to have insurance to cover any liability it might incur for pollution caused by the operation of its gasoline stations, including any cleanup costs. Down East understood that the insurance provided by Niagara policies No. CBP 55253, 55246, 55343, and 55423 all provided that coverage and was never advised by Morse Payson & Noyes that the coverage was other than as had been requested by Down East.

> Down East canceled Policy No. CBP 55423 effective December 23, 1986, and simultaneously purchased an Extended Reporting Endorsement on that policy running to December 23, 1987. It canceled the policy because it needed a pollution liability policy with higher coverage limits.

> At the time that Down East purchased the Extended Reporting Endorsement, Niagara never told Down East or Morse Payson & Noyes that, as it now claims, the Endorsement did not apply to government ordered cleanup.

If Down East had known of that alleged limitation it would have made other arrangements. The liability risk of government ordered cleanup was so great that it would not have canceled the policy until alternate coverage was in place.

If, as Niagara claims, it had thus far limited its discovery efforts in preparation of a defense based solely on the circumstances surrounding the issuance of the principal insurance policies, Down East's opposition clearly put Niagara on notice that such a narrow discovery strategy would not suffice. Down East filed its opposition to summary judgment on November 24, 1997. Yet, Niagara did not move to reopen discovery until June 18, 1998—less than three weeks before trial was set to begin. We conclude that after the filing of Down East's opposition on November 24, 1997, Niagara persisted in its narrow discovery efforts at its own risk.

In sum, we find Niagara's claims of prejudice and unfair surprise disingenuous. "It is well settled that a trial judge has broad discretion in ruling on pre-trial management matters." *Ayala–Gerena v. Bristol Myers–Squibb Co.*, 95 F.3d 86, 91 (1st Cir.1996). The trial judge acted well within his discretion in denying Niagara's request to reopen discovery at such a late date without good cause. This court will not now save Niagara from the consequences of its narrow and artificial reading of Down East's amended complaint, interrogatory answers, and opposition to Niagara's motion for summary judgment.

## B. Statute of Limitations

At the close of evidence, Niagara moved for judgment as a matter of law on the ground that Down East's claim was barred by the statute of limitations. The district court denied Niagara's motion. We review this decision de novo. *See Provencher v. CVS Pharmacy, Div. of Melville Corp.*, 145 F.3d 5, 13 (1st Cir.1998). Like the district court, we view the record in the light most favorable to the non-moving

party. *See Ansin v. River Oaks Furniture, Inc.,* 105 F.3d 745, 753 (1st Cir.1997).

Both sides agree that the applicable statute of limitations is six years. *See* Me.Rev.Stat. Ann. tit. 14, § 752. The only issue, then, is when Down East's causes of action accrued. The district court found that the causes of action accrued either when Niagara ceased payments, in December 1992, or when Niagara finally denied coverage, in December 1995. Niagara argues that any causes of action accrued when Down East canceled the 1986 policy, on December 23, 1986, and thus predated filing by more than six years.

■ Niagara cites two cases to support this claim. In *Chiapetta v. Clark Associates,* 521 A.2d 697, 699 (Me.1987), plaintiff asked his insurer to cover his clam plant, even in the off-season, when it was closed. The policy did not include such coverage, and the plant burned during the off-season. Plaintiff initially assumed that he was covered, discovering only later his insurer's differing view. Plaintiff sued his insurance agent, alleging that his cause of action accrued when he discovered the lack of coverage. The Law Court held that, once his plant was destroyed, plaintiff had "both reason and means to make an investigation into the extent of coverage … and cannot be heard to argue that he was not cognizant of any lack of coverage." *Chiapetta,* 521 A.2d at 700. In effect, this ruling charged plaintiff with constructive notice of policy limitations, dating to the time of the covered event.

The Law Court followed *Chiapetta* in *Kasu Corp. v. Blake, Hall & Sprague, Inc.,* 582 A.2d 978 (Me.1990), where plaintiff Kasu's insurance agent, without Kasu's knowledge, failed to renew its coverage. After this lapse, an unrelated plaintiff sued Kasu, and Kasu's insurer denied coverage of litigation costs. Kasu sued its insurance agent, in contract and in tort, for failing to renew its policy. The Law Court held that Kasu's tort claims arose when the suit was filed against Kasu, and its contract claims arose when the agent failed to renew coverage.

The Law Court has more recently viewed *Chiapetta* and *Kasu* in a more limited light, in *Palmero v. Aetna Casualty & Surety Co.,* 606 A.2d 797 (Me.1992). In *Palmero,* defendant sold plaintiff insurance including coverage for uninsured motorists. An uninsured motorist injured plaintiff in 1984; defendant denied coverage in 1987. Palmero sued the insurer in 1991. The Law Court distinguished *Kasu* and *Chiapetta* on two grounds. Since Palmero sued only in contract, the court declined to consider prior actions in tort. Considering the contract claims, the *Palmero* court noted that in *Chiapetta,* the "alleged breach was for failure to procure certain coverage, and that breach occurred before the injury sued upon." *Palmero,* 606 A.2d at 798. Similarly, plaintiff in *Kasu* sued the agency for negligent failure to renew a lapsed policy; the injury occurred when the policy expired. In *Palmero,* however, there was no lapse of insurance, only a dispute over its scope. Since "Palmero was a covered insured under a policy that ostensibly covered injuries caused by uninsured motorists … any breach necessarily succeeded the injury." *Palmero,* 606 A.2d at 798.

*Palmero* governs our decision here. In *Palmero,* as here, plaintiff directly sued the insurance company; in *Chiapetta* and *Kasu,* plaintiffs sued their insurance agents. In *Palmero,* as here, plaintiff contended that her insurance covered her injuries; in *Chiapetta* and *Kasu,* plaintiffs admitted they were uncovered, and sought relief against their agents for negligent failure to procure the correct coverage. Finally, the facts of this action demonstrate why *Palmero* should control. After an initial, unrelated denial of coverage, Niagara made substantial payments, totaling $137,004, towards Down East's claim. These payment cured any outstanding breach; only once they ceased could Down East again have notice that Niagara disputed its obligation under the policy. Were we to hold otherwise, an unscrupu-

lous insurer faced with an arguable claim could make small payments for six years, cut off the insured, and avoid litigation entirely.

As a result, the six-year limitations period commenced no earlier than Niagara's final reimbursement in December 1992, and Niagara's action is not foreclosed. We need not decide whether Niagara's final denial of coverage, in December 1995, is a more appropriate date.

## C. Sufficiency of the Evidence

At the conclusion of Down East's case and at the close of evidence, Niagara moved for judgment as a matter of law on the ground that Down East had failed to produce any evidence to support two essential elements of its estoppel claim. The district court denied both of these motions. Again, we review de novo the district court's denial of judgment as a matter of law. *See McMillan v. Massachusetts Soc'y for the Prevention of Cruelty to Animals*, 140 F.3d 288, 299 (1st Cir.1998). We must sustain the district court's denial of a Rule 50(b) motion, "unless the evidence, together with all reasonable inferences in favor of the verdict, could lead a reasonable person to only one conclusion, namely, that the moving party was entitled to judgment." *PH Group Ltd. v. Birch*, 985 F.2d 649, 653 (1st Cir.1993).

Under Maine law, the elements of estoppel are: "(1) unreasonable conduct of the insurer that misleads the insured concerning the scope of his coverage, and (2) justifiable and detrimental reliance by the insured upon the insurer's conduct." *Maine Mut. Fire Ins. Co. v. Grant*, 674 A.2d 503, 504 (Me.1996). In addition, because Down East bases its estoppel claim on misrepresentations made by Quinlan, as an agent of Niagara, Down East had to prove that Quinlan was acting within the scope of his authority when he recommended the purchase of the extended reporting endorsement to Down East. Niagara contends that it was entitled to judgment as a matter of law because

Down East failed to produce any evidence that (1) Quinlan's conduct was authorized by Niagara, and (2) Down East justifiably relied on Quinlan's conduct.

Section 2422 of the Maine Insurance Code states: "The authorized agent of an insurer shall be regarded as in the place of the insurer in all respects regarding any insurance effected by him." Me. Rev.Stat. Ann. tit. 24–A, § 2422. Niagara does not dispute that Quinlan was an "authorized agent" within the meaning of this statute. Rather, Niagara disputes the scope of Quinlan's authority. Specifically, Niagara argues that as an "authorized agent" of Niagara, Quinlan had authority to sell Niagara policies and generally to act in the best interest of Niagara, as principal. Niagara contends that in making his October 9, 1986 proposal to Down East, Quinlan was acting outside the scope of his authority because he recommended that Down East cancel its Niagara policy and purchase a policy with higher coverage limits from ISLIC. In making this argument, Niagara refuses to acknowledge that Quinlan's proposal also recommended that Down East purchase an extended reporting endorsement from Niagara. We agree with the district court that a reasonable jury could conclude that, by recommending that Down East purchase an extended reporting endorsement to its Niagara policy, Quinlan was acting within the scope of his authority.

Indeed, Quinlan testified that before selling the endorsement to Down East, he received express authorization and approval from an underwriter at Niagara. As Niagara points out, Quinlan also testified that in recommending that Down East cancel the Niagara policy and purchase the ISLIC policy with higher coverage limits he was acting in the best interest of Down East. But it does not necessarily follow that his recommendation was therefore unauthorized. The end result was still the

sale of an extended reporting endorsement issued by Niagara.[6]

Finally, throughout this litigation, Niagara has not contested the facial validity of the endorsement drawn up by Morse, Payson & Noyes. By contesting only the meaning of the endorsement's terms, Niagara effectively admits that Morse, Payson & Noyes was authorized to bind Niagara, and validly did so through the sale of the extended reporting endorsement. Such authorization is the hallmark of agency. Niagara cannot accept the endorsement as valid, while simultaneously arguing that Morse, Payson & Noyes was not authorized to sign it.

■ Niagara next challenges the sufficiency of the evidence supporting Down East's justifiable reliance on Quinlan's misrepresentations. First, Niagara contends that Down East failed to produce any evidence that Down East relied on Quinlan's misrepresentations. However, John Peters, executive vice president of Down East, testified specifically that in purchasing the extended reporting endorsement from Niagara he relied on the recommendation of Quinlan that the endorsement would allow for a transition from the Niagara policy to the ISLIC policy "with no gap in coverage." Peters further testified that had Quinlan informed Down East that coverage under the endorsement was not as broad as coverage under the 1986 Niagara policy, it would not have canceled the 1986 policy, but instead would have purchased an additional policy. Peters's testimony provides sufficient evidence from which a reasonable jury could conclude that Down East relied on Quinlan's misrepresentations when it opted to cancel the 1986 policy and purchase the endorsement.

There is also sufficient evidence in the record to support Down East's claim that it relied on Quinlan's misrepresentations to its detriment. It is undisputed that Quinlan misrepresented that the endorsement would extend for one year the reporting period for all claims for past pollution incidents.[7] As discussed, Peters testified at trial that, in opting to exercise this option, Down East relied on Quinlan's misrepresentation that the extension applied to *all claims for past pollution,* including claims made as a result of government ordered cleanups. Peters explained that, had Down East known that the endorsement did not extend the reporting period for government ordered cleanups, it would not have not have canceled the 1986 policy, but instead would have purchased an additional $500,000 policy. It is further undisputed, for purposes of this appeal, that if Quinlan's statement had been accurate, Niagara would be liable for the costs incurred by Down East as a result of the government ordered cleanup because the claim was brought within the one year extension period. Yet, because of its reliance on Quinlan's misrepresentation, Down East's claims are not covered by the Niagara endorsement. Clearly, there was sufficient evidence to support Down East's claim of detrimental reliance.

Finally, Niagara contends that any reliance by Down East was unreasonable as a matter of law because the language of the 1986 policy unambiguously limits the extension of the reporting period to claims for bodily injury and property damage only. At trial, Peters admitted that he never read the Niagara pollution liability insurance policies or the terms of the extended reporting endorsement. Niagara relies on *Card v. Nickerson,* 150 Me. 89, 104 A.2d 427, 431 (1954), for the proposi-

---

6. Again, we note that when asked at trial why he did not recommend a Niagara policy with higher coverage limits, Quinlan explained that Niagara was unwilling to provide Down East with increased coverage. *See supra,* note 1.

7. Quinlan wrote: "This option [the cancellation of the 1986 policy and the purchase of the endorsement], if exercised, allows for a transition from one claims-made policy to another with no gap in coverage, provided that all claims for past pollution incidents are brought within one year."

tion that a party may only successfully assert a claim of estoppel if it "had no knowledge of the true state of facts, and . . . did not have the same means of ascertaining the truth as did the other party." Niagara therefore contends that Down East's failure to read the policies renders its reliance on Quinlan's misrepresentation unreasonable as a matter of law. We disagree.

These circumstances are very different from those in *Card*, which involved a real estate transaction between two neighbors, where both individuals had "the same means of ascertaining the truth" about the location of a water course on the parcel that was sold. *Id.* In the present case, Down East informed Quinlan of its need to increase its pollution liability insurance coverage from $500,000 to $1,000,000 due to new federal EPA requirements. In the fall of 1986, Quinlan and Down East met to discuss various ways to meet these new insurance requirements. In the context of these discussions, Quinlan recommended the cancellation of the 1986 Niagara policy and the purchase of the extended reporting endorsement. In making this recommendation, Quinlan was aware of Down East's insurance needs and the risks posed by its involvement in the gasoline and heating oil industry. Peters testified that, as a lay person in the gasoline and home heating oil business, he did not understand the nuances of insurance law and therefore relied on the agent's representation that Down East would have no gaps in coverage.

We reject Niagara's contention that such reliance was unreasonable as a matter of law; whether such reliance is reasonable is a question of fact for the jury. *See Roberts v. Maine Bonding & Casualty Co.*, 404 A.2d 238, 243 (Me.1979). *Roberts* held that a "showing that an insurance agent told the insured that his policy contained full liability coverage may be sufficient to estop the insurance company from relying on an exclusion in the policy to deny coverage." *Id.* at 241–42.

The circumstances of the present case provide a stronger case than *Roberts* or letting the case go to the jury. In *Roberts,* the court noted a "factual issue" as to "whether, through the Defendant's failure to warn the Plaintiff's that occupancy was a condition of coverage, the Defendant misled the Plaintiffs into the reasonable belief that the existing vacancy would not bar their coverage." *Id.* Here there was not simply a failure to warn but an affirmative misrepresentation by Quinlan to Down East, at a time when Quinlan was fully aware of Down East's insurance situation, that the endorsement would leave "no gaps in coverage." Thus, we disagree with Niagara that Down East's reliance on Quinlan's assurance that there would be "no gap in coverage" was unreasonable as a matter of law.

## II. Conclusion

For the reasons stated above, we affirm the judgment of the district court.