US v. Murray                              CV-03-194-JD  03/10/04

UNITED STATES DISTRICT COURT FOR THE
                       DISTRICT OF NEW HAMPSHIRE


<u>United States of America</u>

     v.                                Criminal No. 03-194-JD
                                       Opinion No. 2004 DNH 042
<u>Roderick Murray</u>

                            O R D E R


     Roderick Murray has moved to suppress statements he
allegedly made to police while they questioned him as part of
a bank robbery investigation on the ground that the
questioning violated <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).
He also seeks suppression of a written confession he provided
at the close of the questioning, after he had executed a
written waiver of his <u>Miranda</u> rights, on the ground that the
confession was nevertheless involuntary.  The government
objects to suppression.

     With its objection, the government submitted the
affidavits of the two officers to whom Murray allegedly
confessed, Lieutenant Scott Carline of the Newmarket, New
Hampshire police department and Detective Daniel Rivard of the
Manchester, New Hampshire police department.  Both Murray and
the government have also submitted documentary evidence,
including reports of the investigation prepared by Carline and
Chief Rodney Collins of the Newmarket police department, a

photograph of the room where Murray was questioned, and an image from a bank security camera which Murray was shown during the questioning. The following findings of fact are based on these materials as well as the testimony of Carline and Rivard at an evidentiary hearing of February 13, 2004. See United States v. Schaefer, 87 F.3d 562, 570 (1st Cir. 1996) (noting that court "may receive and consider any relevant evidence" at suppression hearing).

## Background

Murray was working at his job as a bagger at a Vista Foods supermarket in Manchester on October 20, 2003, when a group of five men came in his direction: Carline, Rivard, Collins, Special Agent John Mulvaney of the Federal Bureau of Investigation, and store manager Roy Burke. Carline and Rivard walked in the front rank of this group while the others remained several feet behind. Carline and Rivard approached Murray from one side of the register where he was working; the other men took a position at a distance of approximately six feet from Murray on the other side of the register. None of the law enforcement officers was in uniform. Rivard, wearing his badge on a chain around his neck and his sidearm in a holster on his hip, introduced himself to Murray as a

2

detective with the Manchester police. Because Rivard was not wearing a sportcoat, these items would have been visible to Murray. Carline, however, was wearing a jacket, so his badge and gun remained out of sight.

The officers were investigating a series of three bank robberies and another attempt at one which had occurred in Manchester and Newmarket, New Hampshire, and Brattleboro, Vermont, between September 11, 2003, and October 10, 2003. The investigation led to Vista Foods in Manchester after authorities discovered a receipt from the store in the pocket of a shirt abandoned in a wooded area approximately two miles from the bank which had been robbed in Newmarket. A witness to the Newmarket robbery identified the shirt as that worn by the perpetrator. The witness also identified the Newmarket bank robber as the same person shown holding up the Brattleboro bank in an image from its security camera. A photograph taken of the culprit in the Manchester robbery showed that he, too, strongly resembled the Brattleboro suspect.

Upon their arrival at the supermarket, Rivard, Carline, and Collins showed the photograph from the Brattleboro robbery to several Vista employees, some of whom remarked that it depicted a person who resembled one of their co-workers,

3

Murray.[1]  The officers also learned that Murray had not been at work on the day of either the Newmarket or Brattleboro robbery but that he was working on the day of the Manchester robbery.  This latter piece of information was significant because Murray had access to a white van while at work that resembled a vehicle reportedly driven by the suspect in the Manchester robbery.  The officers also learned that Murray had previously been convicted of bank robbery in Massachusetts.

It was after compiling this information that the officers approached Murray.  According to his affidavit, Rivard "immediately recognized" Murray as the person depicted in the surveillance photographs from the Manchester and Brattleboro robberies.  Rivard testified that as a result he "[p]robably" would not have let Murray leave without speaking to him.  In any event, when Rivard asked Murray to speak to him and Carline, Murray responded, "No problem."  Murray then accompanied Rivard and Carline to an upstairs office suite at the supermarket, which could be accessed only by exiting the building and re-entering through a different door.  Rivard and Carline sat down with Murray in a large office while Mulvaney and Collins waited in a smaller office nearby.  The large

_____

[1]After obtaining this information, the officers contacted Mulvaney, who then met them at the supermarket.

4

office contained four or five desks arranged at intervals along the perimeter of the room.

Rivard and Carline advised Murray at the outset that he was not under arrest and that they were not there to force him to do or say anything. During the course of the questioning, the officers made a number of similar statements to Murray, who acknowledged each time that he understood. Murray was never expressly told that he was "free to leave," however. Rivard began the questioning by spending several minutes asking Murray about his personal background, refraining from making any inquiries about his criminal record.

After again telling Murray that the officers did not intend to force him to do anything, Rivard told Murray that they were investigating a string of local bank robberies. Murray initially disclaimed knowledge of any robberies. Rivard then displayed the surveillance photographs from the Manchester and Brattleboro robberies and asked Murray whether he recognized the person depicted and whether he thought it looked like him. According to Rivard, Murray did not make any verbal response to either of these questions, although he began showing signs of nervousness.

Carline then accused Murray of being the person in the photographs, which he denied. Perceiving "deception" in

5

Murray's response, Carline advised him that "it was time to be truthful" and offered to make a favorable recommendation to the FBI as to Murray's sentence if he cooperated. For his part, Rivard told Murray that the officers knew he was responsible for the robberies and that they wanted only the truth. Although Murray states in the body of his motion to suppress that "he was told 'you're not leaving, just tell us what happened' or words to that effect," both Rivard and Carline expressly denied in their testimony that such a statement was made during the questioning.

A few moments later, Carline asked Murray how many robberies he had committed. Murray responded that he had committed three and, in response to a follow-up question from Rivard, said that the robberies had occurred in Manchester, Brattleboro, and Newmarket. At the time Murray made these admissions, approximately thirty minutes had passed since Rivard began questioning him. During that period, Murray had never asked to leave or otherwise to halt the questioning and neither Carline nor Rivard did anything to restrain Murray's movements or even raised their voices. Both officers conceded, however, that Murray was not free to leave once he had inculpated himself.

Carline then left the office while Rivard questioned

Murray about the Manchester and Brattleboro robberies. Before this line of questioning began, Murray asked for and received permission from Rivard to smoke cigarettes, and proceeded to do so. Murray provided a detailed account of the Manchester and Brattleboro robberies. Rivard then stepped out while Murray provided a detailed account of the Newmarket robbery to Carline. Murray took no more than an hour to recount all of the robberies. At some point during that period, Collins entered to bring Murray a cup of coffee and left shortly thereafter.

After leaving the office again to report to Mulvaney, Carline returned to tell Murray he wanted a written statement, then read Murray his Miranda rights from a Newmarket Police Department form. Murray indicated that he understood those rights and was waiving them by signing on the bottom of that same form. He subsequently wrote out and signed a statement admitting to the three robberies and the additional attempt and signed and dated each of the surveillance photographs as well as the note he had allegedly passed to the Newmarket teller. He was later indicted on two counts of bank robbery in violation of 18 U.S.C. § 2113(a) arising out of the Manchester and Newmarket robberies.

7

## Discussion

"[A] person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). This rule proceeds from the recognition that "any custodial interrogation [is] inherently coercive and that, therefore, careful procedures [are] needed to protect the accused." United States v. Christian, 571 F.2d 64, 67 (1st Cir. 1978) (citing Miranda, 384 U.S. at 455-58).

The "ultimate inquiry" in determining whether a defendant was in custody within the meaning of Miranda "is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Stansbury, 511 U.S. at 322; see also United States v. Fernandez-Ventura, 132 F.3d 844, 846 (1st Cir. 1998). In making this inquiry, the court should consider all the circumstances of the interrogation, including "'whether the suspect was questioned in familiar or at least neutral

8

surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation.'" United States v. Jones, 187 F.3d 210, 218 (1st Cir. 1999) (quoting United States v. Masse, 816 F.2d 805, 809 (1st Cir. 1987)). No single element, however, makes an interrogation either custodial or non-custodial within the contemplation of Miranda. Id.

Murray argues that he was taken into custody within the meaning of Miranda when the investigators first approached him near the register. The court disagrees. Although four different law enforcement officers had headed in Murray's direction, only Carline and Rivard actually walked up to him, with the others trailing and remaining six feet or so away while their colleagues interacted with Murray. None of the men drew his weapon or flashed his badge, though Rivard's gun and badge were visible. After approaching, Rivard simply introduced himself to Murray and asked whether he would speak to him and Carline. Murray immediately agreed, without any physical contact or verbal importuning. Finally, this brief interaction took place entirely within surroundings familiar to Murray, his place of employment.

Under these circumstances, the number of law enforcement

officers present at the scene, while significant, fails to lend a custodial character to this encounter. See United States v. Nishnianidze, 342 F.3d 6, 13-14 (1st Cir. 2003) (holding that defendant not in custody where three officers came to interview him), cert. denied, 124 S. Ct. 1107 (2004); Masse, 816 F.2d at 809-10 (holding that defendant not in custody when approached by two plainclothes officers who identified themselves and asked to converse with him, though other plainclothes officers in area). The court finds that Murray was not in custody before or during his interaction with the officers at the cash register. See United States v. Lanni, 951 F.2d 440, 441-42 (1st Cir. 1991) (upholding determination that defendant not in custody where two agents arrived at her door, identified themselves, and indicated they wished to talk).

In the alternative, Murray argues that Rivard and Carline took him into custody "once he was cornered in the room with multiple police officers and confronted with a photograph of the suspect, which clearly resembled him." The court acknowledges the presence of factors which might lend a custodial character to this encounter. While Rivard's interaction with Murray started off amicably, the tone changed when the officer confronted the suspect with the bank

10

surveillance photographs in response to Murray's denial of involvement in the robberies under investigation.  Courts have considered the fact that police confronted a suspect with "damning evidence of guilt" as weighing in favor of custody. United States v. Carter, 884 F.2d 368, 372 (8th Cir. 1989); see also United States v. Wauneka, 770 F.2d 1434, 1439 (9th Cir. 1985) (affirming conclusion that defendant in custody because, inter alia, police told him he matched description of suspect); State v. Dedrick, 132 N.H. 218, 225 (1989) (applying federal law).

Furthermore, the officers responded to Murray's continued denials with accusations that Murray was lying, a tactic which has been recognized as contributing to a custodial atmosphere. See United States v. Beraun-Panez, 812 F.2d 578, 580 (9th Cir. 1987) (holding that agents had placed defendant in custody by, among other actions, "accusing [him] repeatedly of lying" and "insisting on the 'truth' until he told them what they sought"); Dedrick, 132 N.H. at 225 (affirming ruling that defendant in custody based "[m]ost significantly" on officers' accusations of guilt "[d]espite his vehement denials"); 2 Wayne R. LaFave et al., Criminal Procedure § 6.6(f), at 540 (2d ed. 1999) ("surely a reasonable person would conclude he was in custody if the interrogation is close and persistent,

11

involving . . . the discounting of the suspect's denials");
accord Lanni, 951 F.2d at 443 (weighing agent's expression of
disbelief at suspect's profession of innocence in favor of
custody).

Murray places particular emphasis on his claim that, by
the time Rivard and Carline escorted him to the office, they
"had clearly concluded that, based on the photograph and all
the other evidence, the defendant was the robber.  He knew
that they were not going to let him go free."  As the
government points out, however, "subjective beliefs held by
the interrogating officers or the person being interrogated
are not germane" to the question of whether a suspect is in
custody so as to necessitate Miranda warnings, which turns
solely on "how a reasonable man in the suspect's shoes would
have understood his situation."  United States v. Ventura, 85
F.3d 708, 711 (1st Cir. 1996) (internal quotation marks
omitted); Nishnianidze, 342 F.3d at 13.

Nevertheless, the Supreme Court has recognized that "[a]n
officer's knowledge or beliefs may bear upon the custody issue
if they are conveyed, by word or deed, to the individual being
questioned."  Stansbury, 511 U.S. at 325; accord United States
v. Streifel, 781 F.2d 953, 959 (1st Cir. 1986) (calling
officers' intentions to arrest "relevant only to the extent

12

that they were communicated to the defendants"). In the court's view, both Rivard and Carline not only harbored a strong belief that Murray had committed the robberies they were investigating before they began questioning him, but they communicated this belief to Murray in no uncertain terms. In his affidavit, Carline says he told Murray that he "thought he was the person in the photograph" from a bank surveillance camera, while Rivard testified that he told Murray the police knew he was the person in the photograph. Both officers also suggested to Murray that he was not being truthful in claiming otherwise. These facts therefore bear on the analysis of whether a reasonable person in Murray's position would have understood his status, weighing in favor of a determination of custody. However, "this is simply one circumstance, to be weighed with all the others" in answering the question. United States v. Leese, 176 F.3d 740, 744 (3rd Cir. 1999) (internal quotation marks omitted).

A number of the other circumstances surrounding the questioning cut against Murray's argument that he was in custody before he ultimately received Miranda warnings. First, Murray willingly accompanied the investigators to the supermarket office, exiting and re-entering the building to do so. See United States v. Mahan, 190 F.3d 416, 422 (6th Cir.

13

1999) (fact that defendant voluntarily accompanied agent to different conference room at workplace amidst questioning weighed against custody); 2 LaFave § 6.6(f), at 539 (2d ed. 1999) ("Merely having the suspect move a short distance to facilitate conversation does not in itself constitute custody.")  Once Murray arrived there, moreover, the officers did nothing to restrain his physical movements.  They remained seated throughout the encounter except when rising to leave and re-enter the room after Murray's initial incriminatory statement.

Second, the room in which the questioning took place was large, evidently serving as the office space for at least four different people.  See United States v. Crossley, 224 F.3d 847, 862 (6th Cir. 2000) (weighing fact that defendant questioned in "relatively large" room against custody). Third, only Carline and Rivard joined Murray in the office, while Collins and Mulvaney remained in a different room.[2]  As previously discussed, the presence of two officers during questioning does not tend to render it custodial.  Fourth, in the absence of any contrary suggestion from Murray, the office itself did not represent an unfamiliar environment as it was

_____

[2]The court considers Collins's brief entry into the office to bring Murray a cup of coffee to be insignificant for purposes of assessing the number of officers in the room.

14

part of the supermarket where he worked.  See Leese, 176 F.3d at 744 (upholding conclusion that questioning defendant in supervisor's office not custodial).  Fifth, the length of time which elapsed between when Rivard started his questioning and when Murray finished his oral statement did not exceed ninety minutes and Murray was permitted to smoke and drink coffee during that time.  See Fernandez-Ventura, 132 F.3d at 848 (declining to hold that a detention of eighty minutes "is strongly indicative of arrest"); United States v. Brunette, 76 F. Supp. 2d 30, 34-35 (D. Me. 1999) (concluding defendant not in custody where questioning lasted only one hour, during which he smoked), aff'd, 256 F.3d 14 (1st Cir. 2001).

Finally, and most importantly, the officers repeatedly advised Murray that he was not under arrest and that they did not intend to force him to do or say anything.  See United States v. Ortega-Santana, 869 F.2d 12, 14 (1st Cir. 1989) (upholding determination that defendant not under arrest primarily because he was twice told he was free to leave); McCown v. Callahan, 726 F.2d 1, 5 (1st Cir. 1984) (holding that Miranda warnings not required where suspect was told he was not under arrest and not required to answer questions). Indeed, Rivard gave this assurance both at the outset of his questioning and immediately before announcing that the

15

detectives were there as part of a bank robbery investigation. The foregoing considerations all weigh against a determination that Murray was in custody while in the supermarket office.

On balance, the court concludes that the officers' questioning of Murray in the office did not rise to the level of custodial interrogation at any point before he received his Miranda warnings. The court recognizes that certain facets of the questioning, particularly the confrontation of Murray with the photographs and the rejection of his denials of involvement, make this a close call. Nevertheless, in the court's view, the prevailing "'feel' of the situation," Lanni, 951 F.2d at 443, was non-custodial, characterized by the officers' repeatedly telling Murray he was not under arrest or other compulsion and refraining from the use of any physical restraint upon him, even in such subtle ways as standing up or raising their voices.

Furthermore, the government relies on two cases in which the First Circuit upheld a determination that a defendant was not in custody under circumstances more strongly indicative of formal arrest than those present here. In Nishnianidze, two FBI agents and a local detective knocked on the door of the small room where the defendant was staying at approximately 8 a.m., waking him and his son. 342 F.3d at 12. After the

16

defendant let them in, the officers questioned him for forty-five minutes, asking him to hand over certain documents, never telling him he was free to go, and keeping his roommate from entering. See id. at 13-14. In Lanni, two FBI agents arrived at the defendant's home at 8 a.m., before she had dressed or eaten breakfast, and proceeded to question her for four hours of "increasing intensity," never telling her she was free to leave and having her complete eighty handwriting exemplars. 951 F.2d at 442-43. Just before confessing, the defendant had begun to cry when one of the agents told her that her claim of innocence "did not make any sense." Id. The decisions in Nishnianidze and Lanni provide support for the court's conclusion that under the circumstances presented Murray was not in custody for purposes of Miranda at any time before he finished making his oral confession to the robberies and the attempt.

Murray also argues that not only his oral statements, but also the written statement he gave after receiving his Miranda warning, should be suppressed on the ground that these utterances "were coerced, and therefore not voluntary." Like determining the custodial nature of an interrogation, assessing the voluntary nature of a confession requires the court to examine the totality of the surrounding

17

circumstances. <u>Arizona v. Fulminante</u>, 499 U.S. 279, 286 (1991); <u>United States v. Burns</u>, 15 F.3d 211, 216 (1st Cir. 1994). Based on the factors already discussed in support of its conclusion that Murray was not in custody at any point before he completed his oral confession, the court similarly concludes that the confession was not coerced. <u>See</u>, <u>e.g.</u>, <u>United States v. Rosario-Peralta</u>, 199 F.3d 552, 564 (1st Cir. 1999) (upholding determination of voluntariness where agents did not make threats or raise their voices and defendants indicated they understood their rights).

Finally, the court determines that the written confession which Murray provided after he was read his <u>Miranda</u> rights was also not the product of coercion. "In deciding the voluntariness of [a post-warning] statement, a valid waiver of <u>Miranda</u> rights is normally dispositive." <u>United States v. Esquilin</u>, 208 F.3d 315, 319 (1st Cir. 2000) (citing <u>Oregon v. Elstad</u>, 470 U.S. 298, 314 (1985)); <u>see also</u> 2 LaFave § 6.2(c), at 460 ("the fact that [<u>Miranda</u>] warnings were given is an important factor tending in the direction of a voluntariness finding"). Here, Carline read Murray a <u>Miranda</u> warning from a preprinted police department form, which was subsequently handed to him. Murray then signed the form in a blank provided under a section entitled "WAIVER," indicating that he

18

understood his <u>Miranda</u> rights and was waiving them voluntarily, knowingly, and intelligently. Murray has not suggested that he did not, in fact, understand his rights or the import of his waiving them.[3] Furthermore, Carline was the only one in the room with Murray when he gave the written statement and procured it simply by asking.

Under these circumstances, the court cannot conclude that Murray's written confession was involuntary. Murray asserts that suppression of the written confession is dictated by <u>United States v. Byram</u>, 145 F.3d 405 (1st Cir. 1998). There, however, the statement in question shared "a substantial nexus" with an initial <u>Miranda</u> violation and was "not itself preceded by an adequate <u>Miranda</u> warning" because none was required at that point, when the defendant was called to testify at his friend's criminal trial. <u>Id.</u> at 409-10. Here, however, not only was there no <u>Miranda</u> violation with regard to Murray's oral confession, but Murray in fact received a <u>Miranda</u> warning before executing the written confession. Furthermore, the defendant in <u>Byram</u> made his initial inculpatory statement while in custody on an unrelated charge

---

[3]In fact, according to Carline's affidavit, Murray initially rebuffed the suggestion that he should cooperate in the investigation because "the last time he cooperated, he ended up serving four years in Massachusetts," an apparent reference to his prior bank robbery conviction.

19

and after his questioner assured him "that he was not 'implicated in any of this.'" Id. at 406. Murray, in contrast, was neither in custody nor lulled into a misplaced sense of security by Carline or Rivard, who affirmatively accused him of criminal activity. Byram is therefore inapposite.

## Conclusion

For the foregoing reasons, Murray's motion to suppress his alleged oral and written confessions (document no. 12) is denied.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

March 10, 2004

cc:  Jonathan R. Saxe, Esquire
     Donald A. Feith, Esquire
     U.S. Probation
     U.S. Marshal